## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IVY G. BAILEY )
     Plaintiff )
)
       vs. )    Civil Action 7-1494 (ESH)
)
VERIZON COMMUNICATIONS, INC. )
)
     Defendant )

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Comes now Plaintiff Ivy G. Bailey, Pro Se, and responds to Defendant's Motion to Dismiss Plaintiff's Complaint as follows:

1.  Plaintiff denies Defendant's assertion that Plaintiff waived her rights to bring this Complaint by signing the release listed as Defendant's Exhibit One in the aforementioned motion. Plaintiff, upon receiving the release, immediately took it to the EEOC office to inquire about the effects of signing it on her case. Plaintiff spoke with EEOC Officer Joanne Frazier, who sat down with Plaintiff and went through the release. Ms. Frazier assured Plaintiff that signing the release would in no way affect her ability to bring suit against Defendant. Plaintiff relied on this statement in signing the release.

2.  Plaintiff further requests that this Honorable Court consider the circumstances surrounding Plaintiff's signing the release. Plaintiff was instructed that she would not be able to receive her severance pay without signing the release. At the time, Plaintiff was faced with a substantial economic hardship, unable to pay her mortgage or other life sustaining bills. Plaintiff was forced to sign the release under duress, and with no alternatives.



RECEIVED

SEP 2 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

3. Plaintiff further asserts to the Court that Plaintiff's initial complaints with EEOC were filed prior to the release being signed. The delay in processing was an error on the part of EEOC, not the Plaintiff.

4. Plaintiff denies Defendant's assertion that her age discrimination complaint was untimely filed with EEOC. Plaintiff originally spoke with EEOC regarding her harassment prior to December 18, 2006. Plaintiff was told then that EEOC did not have a category for my claim of Ethics violations and would use their classification of age discrimination. (See Exhibit I EEOC Complaint and Statement of Fact). After not receiving a timely response, Plaintiff inquired about the status and learned that no appropriate action had been taken by the worker assigned to her case. Plaintiff then filed her complaint again on December 18, 2006.

5. Plaintiff denies Defendant's assertion that her state law claim of discrimination under the District of Columbia Human Rights Act (DCHRA) is untimely. Any delay in Plaintiff's filing suit was in response to the delayed response to EEOC. Plaintiff could not file a comprehensive and complete complaint without the outcome of the EEOC investigation. Although the suit was not actually filed until July 2007, Plaintiff did begin the formal complaint process within one year of the alleged harassment.

6. Plaintiff asserts that her claims of harassment are not based on Defendant's decision in hiring outside Counsel. Rather, Plaintiff's assertion is based on the harsh and discriminatory treatment she received from her supervisors following her complaint to the Ethics Board of the Company. The exception clearly applies to violations of public policy, (See Exhibit II Employee Ethics Handbook); this exception clearly applies to violations of public policy, which is directly applicable to plaintiff's complaint. During the relevant time in Defendant's history, Defendant was coming out of bankruptcy and was dealing with a myriad of corporate scandal. The Ethics Department was created in response to these

events in an effort to protect the interest of the public. Punishing an employee who utilized this Department in an attempt to promote fair dealings and corporate responsibility goes against the very purpose behind the creation of the Department.  (See Exhibit III Ethics Complaint filed by Plaintiff.)

7. Lastly, Plaintiff's complaint was not untimely in regards to receipt of Plaintiff's right to sue letter.  Plaintiff's right to sue was initially signed on February 23, 2007.  Plaintiff moved during that time and the Right to Sue letter was mailed to Plaintiff's old address.  Plaintiff was sent a letter and reissued the right to sue letter top her accurate address.  This letter notified her of her extension of time to file, with July 19, 2007 as her deadline date for filing.  (See Exhibit IV).

Wherefore, all reasons considered, Defendant's Motion for Dismissal should be denied and Plaintiff's Complaint should be set in on the normal course of action.

Respectfully Submitted,

Ivy G. Bailey, Pro Se
1774 Manor Road
Windsor, PA 17366

## CERTIFICATE OF SERVICE

I hereby certify that this Response to Defendant's motion to Dismiss was mailed first class, postage prepaid this 26 day of September, 2007, to Jacqueline M. Holmes, Esq. Jones Day, Counsel for Defendant, located at 51 Louisiana Avenue, NW. Washington, DC 20001

Ivy G. Bailey, Pro Se
1774 Manor Road
Windsor, PA 17366

# EXHIBIT I

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington Field Office**

1801 L Street, N. W., Suite 100
Washington, D. C. 20507
(202) 419-0700
TTY (202) 419-0702
FAX (202) 419-0701

November 22, 2006

Ms. Ivy G. Bailey
1630 Tucker Road
Fort Washington, MD 20744

EEOC Charge Number:  570-2006-00938

Dear Ms. Bailey:

Enclosed, please find six (6) copies of your amended charge of discrimination.  It was necessary to amend your charge due to an error on its face which referenced discrimination based on the "Age Discrimination in Employment Act of 1964" rather than the Age Discrimination in Employment Act of 1967.  Once your amended charge is received and served, you will receive your notice of right to sue.

Should you have any questions, please call me at (202) 419-0746.

Sincerely,

Elisa Cogswell
Investigator

Enclosure(s):
EEOC Form 5 (6 copies)

EEOC Form 5 (5/01)

# CHARGE OF DISCRIMINATION

| | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 570-2006-00938 |

**D.C. Office Of Human Rights** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Ivy G. Bailey** | **(301) 749-8283** | **09-30-1950** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1630 Tucker Road, Fort Washington, MD 20744** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **MCI, INC.** | **Unknown** | **(202) 736-6395** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1133 19th Street, N.W., Washington, DC 20036** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☒ AGE ☐ DISABILITY ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **02-01-2006** Latest **02-01-2006**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began employment with the above named Respondent on November 13, 2000 and held the position of Executive Administrative Assistant in the Employment Law Section. In November 2005, I sent a letter to Respondent's Executive Vice President Nancy Higgins in the Ethics department complaining of a hostile work environment that had been created. I met with the Vice President of Employment Law, twice, nothing was resolved. On February 1, 2006, I was informed that I was terminated and requested to sign a severance plan. On or about February 10, 2006, I accepted Respondent's severance plan.

I believe that I was discriminated against because of my age, 55 years, and subjected to retaliation, in violation of the Age Discrimination in Employment Act of 1964.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Apr 18, 2006**<br>Date    *Ivy H. Bailey*<br>*Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

**PRIVACY ACT STATEMENT:** �456 'er the Privacy Act of 1974, Pub. ⎥ 93-579, authority to request personal data and its uses are.

1.   **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (5/01).

2.   **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117.

3.   **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.   **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.   **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII or the ADA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

**Ivy G. Bailey**                                        **March 13, 2006**

**EEOC Complaint Attachment**

**Statement of Fact**

I have been employed by MCI, Inc. ("MCI") (formally WorldCom) for over five years as an Executive Secretary/Administrative Assistant in the Law and Public Policy Department ("LPP"). I was transferred from a temporary to permanent employee. Since the scandal, bankruptcy and reorganization I have been assigned to several teams within LPP. Throughout the process of bankruptcy and reorganization, I felt that my continued employment with MCI, Inc. ("MCI") was unstable. The attorneys to whom I was originally assigned to (Laurie B. Adams and Jeffrey T. Hsu, patent litigation) and several others, including the support staff, sought and obtained employment elsewhere. I was also going on interviews.

Before being transferred to Employment Law, I was assigned to two attorneys Alexander Jackins and Megan Lawless. Then transferred to Operations, this is the branch of LPP that handles invoices from outside counsel (Firms), and any expenses incurred by LPP departments in defense of MCI's position. The firms included: mediation, document production, experts, photocopying etc. My direct supervisor of Operations was Terry Martin. I was then moved to the Employment Law section, where I worked directly for Harvey D. Rumeld, Esq., ("H. Rumeld") at the time Chief of the Employment Law section who has since been promoted to VP of Employment Law.

When new Executive Management came on board, H. Rumeld informed me that the Employment Law Section was moving to Ashburn, VA, where MCI's Headquarters are located. He asked if I was willing to commute to Ashburn. I told him no, that it was too much of a commute and that I would continue to seek employment elsewhere. He began interviewing several candidates for secretarial support. But ultimatley Employment Law was not moved to Ashburn, VA.

While being secretarial support for H. Rumeld one of my duties was to open and sort all incoming mail. During the period of time, Senior Management demanded that all of the law firms that acted as outside counsel for MCI submit proposals with their rates to render legal services. The mandate from Senior Management included the stipulation of what MCI was willing to allow in terms of billable hours. H. Rumeld's brother Myron D. Rumeld, Esq. (M. Rumeld), then partner of Proskauer Rose, LLP sent an agreement for his firm to render legal services to MCI. It was signed and approved by H. Rumeld. I don't know who gave the approval from senior management. Before the agreement was signed, M. Rumeld's secretary called and stated that attorneys of the firm Proskauer Rose, LLP ("Proskauer") had a meeting scheduled with H. Rumeld. She asked for directions, and whether the meeting was to be held at the 19th street, NW office

1

or Ashburn, VA. and whether the party would need a car. I had no prior knowledge of the arrangement. I relayed the message to H. Rumeld who was out of the office. He told me told me the meeting was going to be held in Ashburn, VA and that the party was coming in to Dulles Airport which was close to Ashburn and that the party could take a cab. I looked up the firm in Martindale because the secretary did not leave a number. The results of my search revealed that M. Rumeld was a partner of the Firm. I knew he was H. Rumfeld's brother because I had taken several messages over time from M. Rumeld to H. Rumeld. I then called Proskauer and left the message that the meeting was being held in Ashburn, VA and that the party could take a cab.

During this time period of restructuring MCI the Ethics Department was put in place by the Sarbanes-Oxley Law to make sure that ethical business practices were being followed and to oversee and educate all employees of required ethical business and professional duties. It was also, to be an entity that was separate from any department within MCI and that any unethical activity could be reported.

The arrangement that was made between the Employment Law section and Proskauer appeared to be unethical. I did not know if this was an arrangement that was approved by senior management. According to the Ethics' training and rules, it was a major impropriety. I did not immediately report the arrangement to Ethics. I had discussed ways to report the infraction anonymously but did not because I was not sure whether or not Senior Management had approved. I also did not want to rock the boat and lose my job.

Shortly thereafter, without a valid explanation, I was reassigned to the other attorneys on the Employment Law Team; David R. Shopfner, Esq.; ("D. Shopfner") Jeffrey A. Spector, Esq.,("J. Spector") Eric M. Cotts, Esq., ("E. Cotts") and Kathleen K. Tremblay, Esq., ("K. Tremblay") I felt that the move was a demotion. I asked H. Rumeld if it was a demotion. He said it was not and that the reassignment was made so that the attorneys would have support from me, with my working knowledge of the proper procedures of the department. Also, that the attorneys had to put up with temporary support that did not complete assignments as thorough as they needed to be. My job title would not change. H. Rumfeld then brought in another secretary to replace me.

K. Tremblay is the attorney that handled international employment that included Latin America, Canada and Guam. She worked directly with Proskauer which is the firm that acts as MCI's outside counsel on international matters. Proskauer also recommends law firms in Latin America that act as contractors in international matters. Practically every month she would loudly complain about the invoices submitted from Proskauer. Her main complaints were overcharging, charges that were for items that were not billable, work that was not authorized and poor attorney work product. K. Tremblay would ask that I PDF various invoices to her so that she could send them as an attachment in an email she

2

planned on sending to complain about the charges. I also faxed and emailed PDF documents directly to Don Dowling of Proskauer. In her telephone calls to Mr. Dowling, you could hear K. Tremblay screeching and yelling about above listed problems with invoices received from Proskauer that required her approval. She always requested a copy of all invoices from every firm that she had approved. I was also instructed to keep copies of invoices from the various contractors whenever K. Tremblay disputed either the billing or what Proskauer was to be responsible for doing.

During this year while Qwest and Verizon were bidding to purchase MCI it has been at different periods a crunch on the turn-around time for several documents to be submitted to various entities outside of MCI from the Employment Law Team. The documents covered the facts in the pre- and post-cases being handled by the Employment Law Section. After the bid was accepted approved for Verizon to purchase MCI, our Department was again required to submit a significant matters report. The deadline for the submission of the report was tight. D. Shopfner needed several pleadings scanned in order for him to manipulate the contents of the pleadings into the significant matters he worked directly as required part of the report. To scan the documents into the format he could use, I had to go to the seventh floor feed the documents into the scanner and store on disk. After completing the scanning the output had to be cleaned up. That required that I go through the document line-by-line and take out any type that was added or scrambled. At the same time that I was working on this project, K. Tremblay needed edits made to a document she had to submit. She came up to my desk, fussed at D. Shopfner who was standing in front of my desk. She told him that he was taking up all of my time and that other people needed me to assist them beside him. E. Cotts also needed me to assist him with a project (scanning also), but he said that what he needed could wait.

I then started making edits to the document that K. Tremblay needed. During this time D. Shopfner requested that I scan 10 more pleadings that he needed a few of them being over 20 pages. I did not know that the document I was working on for K. Tremblay was write-protected. I made the edits, saved and closed the document. I then went to the seventh floor to scan the second round of pleadings for D. Shopfner and the one document for E. Cotts. When I got back to the office K. Tremblay called me into her office to ask me what happened to the document and that none of the edits were in the documents and that the footnotes were all wrong. I looked through the document and thought that I may have skipped the edits. She had made corrections to the document's footnotes. I was then told to fix the document right now, I don't care who you call just fix it. I finally had enough time to figure out that the document was write-protected. To be sure I called Lonzena Rogers and asked her what was the best way to correct and save any changes made in a write-protected document. I made the edits copied and saved it as a separate document.

3

K. Tremblay came out of her office yelling, "Who did you call? What did you do? What is the name of the document?" All of which I wrote off as an episode of K. Tremblay being volatile. It was her usual behavior.

Shortly after H. Rumeld came up to me in a flip manner and said, "Ivy, I know you know were a Popeye's Chicken is, those biscuits." It stuck me as being odd. A few years ago, he invited the group to his house for a cookout. The email invitation said it was a Kosher house. I had heard that Popeye's Chicken used lard. I felt that H. Rumeld asking me twice about Popeye's Chicken was a racial slur. I did tell him earlier that there was a Popeye's Chicken on F Street. The second time he asked I told him that Pillsbury produced a frozen biscuit that was pretty good. His response was, "no that won't help at lunch time". E. Cotts was standing next to him. I did not respond to the question because it was unnerving and I did not want to launch into an argument.

K. Tremblay apologized for her outburst a few days later. I accepted her apology and told her it was no problem. As stated above, Ms. Tremblay will make her opinion known loudly. That I thought was the end. From then on the work environment has gone down hill. Shortly there after, sniping at me began coming from all directions within the Employment Law Section. Sometimes I was snubbed. The common courtesy of good morning, as known throughout the support staff, was never extended by most of LPP's Attorneys. Although being snubbed happened sporadically in the Employment Law Section it was not a major concern of mine. Over the years I had gotten use to it.

As I stated above the dynamics' of my relationship with K. Tremblay had changed. After going through the files in her office looking for a file that I know I have given her that was labeled and included in a labeled redwell. That she found on her desk. She yelled out to me, "Ivy please promise me that you will shoot me". That statement was disconcerting. I felt that if any response would have lead to an argument. And that it was unprofessional. It was always something negative when I had to deal with her. I felt she was always trying to imply situations that were not true. She would make statements like, "Please don't take my husband." I don't want anyone's husband. After I went on vacation and decided to go on a diet due to health concerns, she commented that I had lost a good amount of weight and that it looked good. She asked what I was doing? That she was going to join me on a diet after she gave birth to her second child. Then at another time she said D. Shopfner noticed that I had lost weight and that he noticed everything. Her tone and demeanor implied that there was a sexual interest between D. Shopfner and myself, which made me extremely uncomfortable.

4

At the same time the Millions More March was happening downtown. I looked through her newspaper to see what time and what streets were going to be closed that evening to decide what route to take home. She asked if I was going to the March, in an offensive manner. I snapped back, "You go. That is what I think of it." I left her office.

E. Cotts is the Benefits/Health and Welfare attorney that I support and had good rapport with. He would talk about his family, wife and kids, sports. I would tell him about my kids, my grandchildren. He had once given me tickets that he could not use to a Nationals' game. Via email E. Cotts had invited the whole section to his house for an Octoberfest celebration October 15, 2005. I replied that I accepted the invitation and would attend. By the morning of October 14th I did not press the issue or the fact that he had not responded with his address or directions to his house because the work environment had become almost unbearable. He walked passed my desk several times that day without speaking or looking in my direction. Then, at 5:15 that evening, E. Cotts emailed the directions to me specifically. It was unnecessary. By that time, I had no intention of attending.

D. Shopfner had begun to act strange and the dynamics of our relationship had begun to change. Then I thought about what K. Tremblay was implying. Anytime I was seen conversating with D. Shopfner, others in the unit would imply that I was in love with him. Although we had developed a friendly working relationship none of our conversations could be construed as romantic or implied to be so on his or my part. Nothing suggested could lead either one of us to believe that romance was what I or he wanted. Subjects included: his dog, my vacation plans, his vacation plans, he wanted children before he got to old, none of his siblings were married or had children, his sister did not do to good in the love department, to which I responded welcome to the club. I would talk about my children, what field of employment they are in, my son-in-law, my grandchildren and my house.

D. Shopfner came out of his office and tried to start a conversation. I told him to go away. I did not want him or anyone else to think I was in love with him. He pretended that he did not hear what I said. The thought was ridiculous I laughed for the rest of the workday. J. Spector was within earshot.

E. Cotts asked near the end of the day if I could figure out what was wrong with a document that he had to submit to I believe MCI's Board within the next day or so. The footnotes were not renumbering when he made edits that involved deleting one. I told him not to worry about the time, becuase I was waiting to hear from my son who had my car. I needed to confirm the time I was to be picked up from the subway station. He quipped, "It is always something with you." The comment was out of character for E. Cotts. I was upset but again did not want to get into an argument. I looked at the document and looked at my Word manual but could not figure it out. I decided to head home. I gave E. Cotts

the manual and made a call to my daughter who is an IT Trainer I left a message for her to call me about the problem I was having figuring out why the footnotes would not renumber. I also let him know that I would call him as soon as I heard from her. I did call to ask if he had figured it out. The next day when I got into the office I copied the document to create another document and the footnotes had renumbered correctly. Send an email and tried to reach E. Cotts on his cell phone. I thought it was the same problem that occurred with the document being write-protected. Shortly after E. Cotts was out of the office. H. Rumeld was adding to the document.

Somehow, the document developed the problem of the footnotes not renumbering. Again I copied and created a new version of the document. I had time to look at the document with the reveal codes on and looked through the Word manual and realized that the footnotes were being deleted incorrectly. I told H. Rumeld that I had figured the problem out. The footnotes were being deleted incorrectly and the software was holding the space for the deleted footnote. The footnote had to be deleted within the text not from the bottom of the page. He said that he had not deleted footnotes from the bottom of the page and to let E. Cotts know. I sent the explanation and correct procedure via email to E. Cotts. I also was in and out of H. Rumeld's office to explain and show him the different functions for what he was trying to input into the document.

All along comments were being made in my presence that were directly related to me or something I had said. Christina V. Bailey, Esq. ("C. Bailey") an attorney on the Employment team had returned from maternity leave a few months earlier. Maria A. Rossel was her support. She had brought her daughter in and everyone in the group held her. According to K. Tremblay it was a Catholic tradition that everyone holds the baby. I was not comfortable holding an infant and chose not to. She would some time over the course of a month or so after returning to work make sarcastic and belittling comments about my not holding the baby. I thought it was childish, but part of the ongoing harassment.

A case that Harvey worked on was a settlement with U. T. Thomas, a former employee. In the course of me faxing and calling his home, I had to announce where I was calling from because he has a block any anonymous number call. H. Rumeld asked me to put the call through to get Mr. Thomas on the line. I was familiar with the complaint he made and the letters and settlement he was offered and settled for. On two occasions, E. Cotts showed me a settlement agreement for a hundred thousand dollars, and asked if I would like to have a similar amount. Then, on another occasion, K. Tremblay did the same thing, asking if I wanted a similar settlement. Both times, my answer was that everyone could use $100,000.00. I felt that the comments were a result of my known dissatisfaction with my working envirnonment. It was unnerving, frustrating, harassment. Mr. U. T. Thomas whose situation while employed with MCI,' Inc. in a different department was similar to what was going on in Employment towards me.

6

I was familiar with the document because during the time that Mr. Thomas was negotiating the settlement agreement Maria Rossel was on vacation and I was responsible for placing calls to his home in order that Harvey Rumeld could talk to him and to ask if his fax was on to fax him the letters and the proposed settlement. When I got back to my desk the files for a case that Eric Cotts requested from storage was being opened by him. Eric Cotts was looking for the settlement agreement related to the case. He asked me if I wanted a hundred thousand dollars. Again, I just stated that we all could use a hundred thousand dollars.

While on my way to work and listening to the news reports of Rosa Parks' death and that the nation was making arrangements for her to lie in state in the capitol. I decided I was not going to take any more of the harassment. I called in to J. Spector to let him know that I was running late held up in traffic. I then said it was a conspiracy, I am sure he was aware of what was going on. When I arrived I went to Teamnet and printed out the two guiding principles from the 1) Respect the Individual 2) Set the tone at the top. Friday I then requested a meeting with H. Rumeld for the following Tuesday because I wanted to use my last personal day that following Monday I was going to the Capital to show my respect for Mrs. Parks.

I met with H. Rumeld that Tuesday morning; I told him that I did not like the snide remarks that were directed at me or what was being implied. The one point I did bring up is the fact that K. Tremblay had yelled out "Ivy, please promise me that you will shoot me." That the statement along with other reamarks about D. Shofner and her husband had unnervied me and made me uncomfortable. He tried to explain the "shoot me" statement by asking if I had any friends that said just shoot me. I then told him I was not going to debate the issue with him. K. Tremblay was not anyone I considered my friend. I was distraught I ended the conversation, went back to my desk. H. Rumfeld just laughed at the remarks about D. Shopfner.

Right after, K. Tremblay asked that I step into her office. She apologized for anything she may have done that offended me. And asked, "Didn't I want to be transferred over to Verizon when the deal was finalized?" K. Tremblay then asked what it was that she had said. I said I did not want to go into it. Again I accepted her apology. (We need to get along)

Shortly after D. Shopfner walked up to my desk and remarked that I was losing weight. "I notice everything," he said, again in a implying way. The same comment K. Tremblay had made a few weeks earlier. J. Spector was standing nearby.

It was common knowledge that my daughter was an IT Trainer, I loved to brag about her position not so much brag but stick you chest out. I am very proud of

7

my children's accomplishments; don't get me started with my grandchildren. I was asked by E. Cotts what my daughter did. Another drama was staged K. Tremblay asked that I shut down her computer. She had started the process it was a matter of clicking shutdown. I went into her office clicked shut down and was walking out the door. J. Spector was standing practically in the door way watching over me. (Accusing me of going through their computers)

It was a mandatory Ethics training the several sections of LPP would be meeting to discuss different scenarios that could, or maybe happened in the office that called in to play the seemingly questionable decisions that would be considered unethical.

I then typed out a list of what I wanted to discuss:  See Attachment.

Shortly after that my computer was gone through. Chris Abod who is in a different department, walked up and asked me if my adult son had any children and what high school did my grandchildren go to. My grandson Marcus Bailey's resume was on my hard drive. Marcus is my daughter's child, she has two sons. I was uncomfortable. I then complained to Jeffrey Spector he pretended to be totally unaware and I thought that I had not made myself clear and would talk to Harvey Rumeld again. I did so and listed every comments and slur. He wanted to debate every point. I ended the discussion

After my second meeting with H. Rumeld, I asked K. Tremblay to Lunch. Was going to tell her then. Because I felt it was not going to be resolved.

I a left a voicemail message for Nancy Higgins, Executive Vice President, Ethics Exec Trans Team that I needed a venue to file a formal complaint. I sent a letter via facsimile and PDF to her, complaining about the hostile work environment in the Employment Law Section of Law and Public Policy. I realize now that my complaint may have shown that there was a flaw in the Department that she is the Head Executive of. My complaint is the fact that Ethics is working hand-and-hand with the Employment Law Section. As mentioned above when Ethics was set up, my understanding at that time that it was an independent branch that would investigate any complaint employees made about anything that was unethical. The two employees that were reassigned to the Ethics Department in a supervisory capacity were ; Mark Erlich, Esq., and Nichole Bynum, Esq., former LPP attorneys that would routinely call Harvey D. Rumeld and meet with him. He made himself available they both would come to H. Rumeld's office. Steve Helvin would call also. I have no faith or confidence in the system. See attached letter and fax confirmation I also sent an email that included a PDF attachment of the letter.

Friday after sending my request to N. Higgins, Harvey Rumeld and David Shopfner then staged a conversation in front of my desk. Harvey Rumeld was

8

standing in the door of David's office which is directly in front of my desk, holding a complaint form a former employee. Harvey Rumeld said, " I hate when they do this, I usually look at the complaint and say whoa we have to litigate this. They think that because the deal is about to be signed with Verizon that we will settle. It is usually around Christmas you know they are doing it for Christmas money." David Shopfner said, "Yes I hate when they do that." H. Rumeld stated agian, " I usually look at the complaint and say whoa we have to litigate this."

The next day, before my meeting with P. O.  Harvey asked who was representing me.

I know the deal with Verizon is in its final stages.  This is not sour grapes. I was told that  I will be in the layoff.  I am trying to work to the end in order to receive my severance.  I have other incidents and proof that I am being harassed.  I refuse to lose my dignity.  I am not going to be provoked into quitting.  It was announced that Harvey D. Rumeld will be Verizon's VP General Counsel and several of the Employment Law staff will be joining him or have been promised a job with his help.

I believe that the behavior I suffered was a direct result of my witnessing the deal made between H. Rumfeld and MCI and the firm of Proskauer, where Rumfeld's brother was a partner.

9

# EXHIBIT II

# The Way We Work

## MCI's Code of Ethics and Business Conduct



# *The Way We Work*
## MCI's Code of Ethics and Business Conduct

Dear MCI Colleagues,

At MCI, ethical conduct forms the foundation for our business success. Our commitment to high standards in no way diminishes our determination to aggressively pursue success in the marketplace as a superior provider of the industry's most innovative products and services. Indeed, over the long term, being—and being recognized as—a highly ethical company will provide us with a sustainable competitive advantage. History has proven that while some may achieve short-term success by cutting corners, at the end of the day, only the true ethics leaders in industry will remain standing. We shall stand tall among them.

When I began my job as CEO, I set forth ten Guiding Principles that would define the way we work at MCI. These principles were intended to establish the ethics roadmap we all should follow, with the goal of establishing a common culture committed to upholding the highest standards. This Code is anchored in those Principles, and adds additional detail to the framework they provide.

- *Build Trust and Credibility*
- *Respect for the Individual*
- *Create a Culture of Open and Honest Communications*
- *Set Tone at the Top*
- *Uphold the Law*
- *Avoid Conflicts of Interest*
- *Set Metrics and Report Results Accurately,*
- *Promote Substance Over Form*
- *Be Loyal*
- *Do the Right Thing*

This Code, which has been approved by the MCI Board of Directors, applies to everyone who acts on behalf of MCI or its subsidiaries – including employees, executive officers, members of the Board of Directors, agents, consultants, contractors, or others. It is intended as a resource to help guide us in acting responsibly, ethically, and lawfully. Each of us is responsible for knowing and adhering to the values and standards set forth in this Code. Equally important, we all have an obligation to raise questions and to report concerns if we believe that the standards are not being met. The last page of this Code gives complete information on where to go for help.

Because we want our business partners, vendors, customers, and investors to understand the way we work, and what they can expect of us, this Code of Conduct will be made available to the public in our governmental filings and will appear on the Company's Web site.

Our abiding commitment to maintaining the highest standards of ethical business conduct defines our future. Together, we will deliver on our promise.

Michael D. Capellas
President and Chief Executive Officer, MCI

1

# Build Trust and Credibility
*Do what you say and say what you do*

Our business success depends on the trust and confidence we earn from our employees, customers and shareholders. We gain such credibility by keeping our commitments, acting with honesty and integrity, and pursuing our company goals solely through honorable conduct. Although we must say what we do, words only go so far. Ultimately, we will be judged by our actions.

When considering any action, it is wise to ask: will this build trust and credibility for MCI? Will it help create an environment in which MCI can succeed over the long term? Will it satisfy even those who should be our harshest critics—ourselves? Only when the answer to such questions is yes will we be on the way to maximizing trust and credibility.

# Respect for the Individual
*Treat each other with dignity and integrity*

We all deserve to work in an environment where we are treated with dignity and respect. MCI is committed to creating such an environment, because it brings out the full potential in each of us, which in turn contributes directly to our business success. We cannot afford to let anyone's talents go to waste.

MCI draws significant strength from its cultural diversity. Contributions from individuals with differing backgrounds and experiences enrich the work and the work environment for everyone. Moreover, as our global businesses continue to grow, our diversity will become increasingly integral to our success.

MCI is an equal employment opportunity/affirmative action employer and is committed to providing a workplace that is free of discrimination of all types and from abusive, offensive or harassing behavior. Any employee who feels harassed or discriminated against should report the incident to management, Human Resources, or the Ethics Line.

# Create a Culture of Open and Honest Communications

*Everyone should feel comfortable to speak his or her mind*

At MCI, everyone should feel comfortable to speak his or her mind, particularly with respect to ethics concerns. Managers have a responsibility to create an open and supportive environment where employees feel comfortable raising such questions.  We all benefit enormously when employees exercise their power to prevent mistakes or wrongdoing by asking the right questions at the right times.

MCI will investigate all reported instances of questionable or unethical behavior. In every instance where improper behavior is found to have occurred, the Company will take appropriate action. We will not tolerate retaliation against employees who raise genuine ethics concerns in good faith.

Employees are encouraged, in the first instance, to address such issues with their manager or local human resources representative, as most problems can best be resolved locally.  If for any reason that is not possible, or if an employee is not comfortable raising the issue locally, employees have many other resources available, including the Ethics Line (operated by the Office of Ethics and Business Conduct) and the Open Door Line (operated by the Human Resources Employee Relations Solutions Team).

4

# Set Tone at the Top
*Management leads by example*

Managers have the added responsibility for demonstrating, through their actions, the importance of this Code. In any organization, ethical behavior does not simply happen; it is the product of clear and direct communication of behavioral expectations, modeled from the top and demonstrated by example. Again, ultimately, our actions are what matter.

To make our Code work, managers must be responsible for promptly addressing ethical questions or concerns raised by employees, and for taking the appropriate steps to deal with such issues. Managers should not consider employees' ethics concerns as threats or challenges to their authority, but rather as another encouraged form of business communication. At MCI, we want the ethics dialogue to become a natural part of our daily work.

Members of MCI's senior management team have voluntarily executed a pledge in which they affirm their commitment to the principles embodied in this Code and the law. This pledge demonstrates their commitment to building MCI's future success on a foundation of integrity. Any waiver of this Code for executives, officers or directors may be granted only by MCI's Board of Directors and will be promptly disclosed, along with the reasons for granting the waiver, as required by law or stock exchange regulation.

# Uphold the Law
*Put the law of the land on a pedestal*

MCI's commitment to integrity begins with complying with the laws, rules and regulations in the countries in which we do business. Further, each of us must have an understanding of the Company policies, laws, rules, and regulations that apply to our specific roles within MCI. If we are unsure of whether a contemplated action is permitted by law or MCI policy, we should seek advice from Law and Public Policy or contact the Ethics Line. We all are responsible for preventing violations of law and for speaking up if we see possible violations.

Because of the nature of our business, some legal requirements warrant specific mention here.

## Competition

We are dedicated to ethical, fair and vigorous competition. We will sell MCI's products and services based on their merit, superior quality and functionality, and competitive pricing. We will make independent pricing and marketing decisions and will not improperly cooperate or coordinate our activities with our competitors. We will not offer or solicit improper payments or gratuities in connection with the purchase of goods or services for MCI or the sales of its products or services. Nor will we engage or assist in unlawful boycotts of particular customers.

## Proprietary Information

It is important that we respect the property rights of others. We will not acquire or seek to acquire by improper means a competitor's trade secrets or other proprietary or confidential information. We will not engage in unauthorized use, copying, distribution, or alteration of software or other intellectual property.

## Securities Regulation

We will comply with applicable restrictions on securities trading and disclosures. We recognize that the fair operation of the securities markets requires that we not engage in improper trading or disclosures about the securities of MCI. Those involved in such improper activities are subject to severe civil or criminal penalties. Moreover, such activities will inevitably result in adverse publicity and embarrassment to MCI and the individuals involved. Because the securities laws are complex, MCI has published a detailed Statement of Policy concerning Trading in Securities, which is available from Law and Public Policy.

6

### Insider Trading

From time to time we may learn of material, non-public information (known as "inside information") concerning MCI or other companies. We will not buy or sell the stock or other securities (e.g., notes or bonds) of MCI or those other companies or their competitors while in possession of such inside information, nor otherwise use the information for our own personal advantage or the advantage of others.

### Selective Disclosure

We will not selectively disclose (whether in one-on-one or small discussions or meetings, in a presentation or proposal or otherwise) any material non-public information with respect to MCI, its securities, business operations, plans, financial condition, results of operations, or any development or plan. We should be particularly vigilant when making presentations or proposals to customers that our presentations do not contain material, non-public information.

## Health and Safety

MCI is dedicated to maintaining a healthy environment. Because the health and safety of our customers, our fellow employees, and the communities in which we operate is important to us, we will make environmental issues and concerns an integral part of our business decisions and transactions. Accordingly, we will comply with all applicable environmental laws and regulations in the countries where we do business.

## Political Activities

MCI encourages employees to participate in the political process. However, because there are laws restricting political activity by corporations, employees' participation must be on an individual basis, on non-work time, and at their own expense. It is important that there be no appearance that the activity is being undertaken on behalf of MCI. Due to the complex laws and regulations governing corporate political participation, MCI's Law and Public Policy Federal Legislative Group must approve any use of corporate funds or resources for political contributions and other related activities.

MCI sponsored political action committees ("PACs") may be funded only through voluntary contribution from MCI employees. Because we are committed to complying with the Federal Election Campaign Act, as well as other similar laws, rules and regulations governing PAC solicitations and other corporate political activities, we will not solicit for contributions to PACs or use any corporate funds or resources for any political activity unless given specific advance approval by MCI's Law and Public Policy Federal Legislative Group.

7

## International Business Laws

We will abide by the laws, rules and regulations of countries where we do business. MCI operates in countries all over the world. We are committed to following not only U.S. laws that deal with foreign business transactions, but also with the laws of the host countries in which we operate. If cultural differences, local customs or laws create a question of interpretation of this Code, employees should seek guidance from Law and Public Policy or the Ethics Line.

# Avoid Conflicts of Interest
*Carefully and consciously manage various stakeholder interests*

## Conflicts of Interest

We must avoid any relationship or activity that might impair, or even appear to impair, our ability to make objective and fair decisions when performing our jobs. At times, we may be faced with situations where the business actions we take on behalf of MCI may conflict with our own personal or family interests because the course of action that is best for us personally may not also be the best course of action for MCI. We owe a duty to MCI to advance its legitimate interests when the opportunity to do so arises. We must never use MCI property or information for personal gain, or personally take for ourselves any opportunity that is discovered through our Company position.

Here are some other ways in which conflicts of interest could arise:

- Being employed (you or a close family member) by, or acting as a consultant to, an MCI competitor or potential competitor, supplier, or contractor, regardless of the nature of the employment, while you are employed by MCI
- Hiring or supervising family members or closely related persons
- Serving as a board member for an outside commercial company or organization
- Owning or having a substantial interest in a competitor, supplier or contractor
- Having a personal interest, financial interest or potential gain in any MCI transaction
- Placing Company business with a firm owned or controlled by an MCI employee or his/her family
- Accepting gifts, discounts, favors, or services from a customer/potential customer, competitor or supplier unless equally available to all MCI employees

Determining whether a conflict of interest exists is not always easy to do. Employees with conflict of interest questions should seek advice from management or the Ethics Line.

Before engaging in any activity, transaction, or relationship that might give rise to a conflict of interest, employees must seek review through the conflict of interest determination process administered by the Ethics Line.

- The courtesies are not frequent and do not reflect a pattern of frequent acceptance of courtesies from the same person or entity; and
- The courtesy does not create the appearance of an attempt to influence business decisions, such as accepting courtesies or entertainment from a supplier whose contract is expiring in the near future; and
- The employee accepting the business courtesy would not feel uncomfortable discussing the courtesy with his or her manager or co-worker, or having the courtesies known by the public.

### Gifts

Employees may accept unsolicited gifts, other than money, that conform to the reasonable and ethical practices of the marketplace, including

- Flowers, fruit baskets, and other modest presents that commemorate a special occasion
- Gifts of nominal value, such as calendars, pens, mugs, caps, and t-shirts (or other novelty, advertising, or promotional items)

Generally, employees may not accept compensation, honoraria, or money of any amount from entities with whom MCI does or may do business. Tangible gifts (including tickets to a sporting or entertainment event) that have a market value of greater than $100 may not be accepted unless approval is obtained from management and the Ethics Office.

Employees with questions about accepting business courtesies should talk to their manager or contact the Ethics Line.

### Offering Business Courtesies

Any employee who offers a business courtesy must assure that it cannot reasonably be interpreted as an attempt to gain an unfair business advantage or otherwise reflect negatively upon MCI. An employee may never use personal funds or resources to do something that cannot be done with MCI resources. Accounting for business courtesies must be in accordance with approved company procedures.

Other than to our government customers, for whom special rules apply, we may provide non-monetary gifts (e.g. MCI logo apparel or similar promotional items). Further, management may approve other courtesies, including meals, refreshments, or entertainment of reasonable value, provided that:

- The practice does not violate any law or regulation or the standards of conduct of the recipient's organization; and
- The business courtesy is consistent with industry practice, is infrequent in nature and is not lavish; and

11

- The business courtesy is properly reflected on the books and records of MCI.

### Business Courtesies to U.S., State and Local Government Employees

Specific requirements and restrictions apply regarding the offering of business courtesies to government officials or employees. Laws, rules and regulations concerning appropriate meals, gifts, and entertainment for government employees are complex and can vary depending on government branch, state, or other jurisdiction. It is against MCI policy to offer or give a business courtesy to a government employee unless the regulations applicable to that employee permit acceptance of the business courtesy. If you are unsure of the rules, consult with Law and Public Policy or the Ethics Line before offering any courtesy to a government employee.

### Business Courtesies to Foreign Government Officials

The Foreign Corrupt Practices Act, or the laws of other countries, restrict the giving of business courtesies to foreign government personnel or public officials. Employees should consult with the Law and Public Policy International Affairs Group before offering meals, gifts, gratuities, entertainment, or other things of value to any foreign government official, foreign political party or party official, or candidate for political office outside of the United States.

# Set Metrics and
# Report Results Accurately
*Balance between the short and long term*

## Accurate Public Disclosures

The MCI senior management team has pledged to assist in the Company's efforts to furnish investors and the marketplace with a strong and effective disclosure program that exceeds minimum legal requirements and provides consistently high levels of transparency.

We will make certain that all disclosures made in financial reports and public documents filed with the Securities and Exchange Commission, and other public communications, are full, fair, accurate, timely, and understandable. This obligation applies to all employees, including all financial executives, with any responsibility for the preparation for such reports including drafting, reviewing and signing or certifying the information contained therein. No business goal of any kind is ever an excuse for misrepresenting facts or falsifying records.

Employees should inform senior management and the Ethics Line if they learn that information in any filing or public communication was untrue or misleading at the time it was made or if subsequent information would affect a similar future filing or public communication.

If you have concerns about any aspect of our financial disclosures, you should contact your manager, the Ethics Line, Internal Audit or Law and Public Policy. If you are not satisfied with the response you receive, you should report your concerns directly to the Audit Committee of the board of directors.


## Corporate Recordkeeping

We create, retain, and dispose of our company records as part of our normal course of business in compliance with all MCI policies and guidelines, as well as all regulatory and legal requirements.

All corporate records must be true, accurate and complete, and company data must be promptly and accurately entered in our books in accordance with MCI's and other applicable accounting principles.

We must not improperly influence, manipulate, or mislead any authorized audit, nor interfere with any auditor engaged to perform an internal or independent audit of MCI books, records, processes, or internal controls.

13

# Promote Substance Over Form
*Focus on what is important and not what is convenient*

At times, we are all faced with decisions we would rather not have to make and issues we would prefer to avoid. Sometimes, we hope that if we avoid confronting a problem, it will simply go away.

At MCI, we must have the courage to tackle the tough decisions and make the difficult choices, secure in the knowledge that MCI is committed to doing the right thing. At times this will mean doing more than simply what the law requires. Merely because we *can* pursue a course of action does not mean we *should* do so.

Although MCI's Guiding Principles cannot address every issue or provide answers to every dilemma, they define the spirit in which we intend to do business and should guide us in our daily conduct.

## Accountability

Each of us is responsible for knowing and adhering to the values and standards set forth in this Code and for raising questions if we are uncertain about company policy. If we are concerned whether the standards are being met or are aware of violations of the Code we must contact the Ethics Line.

MCI takes seriously the standards set forth in the Code and violations are cause for disciplinary action up to and including termination.

# Be Loyal
*To your families, your company, yourselves*

## Confidential and Proprietary Information

Integral to MCI's business success is our protection of confidential company information, as well as non-public information entrusted to us by employees, customers, and other business partners. Confidential and proprietary information includes such things as pricing and financial data, customer names/addresses, or non-public information about other companies, including current or potential supplier and vendors. We will not disclose confidential and non-public information without a valid business purpose and proper authorization.

## Use of Company Resources

Company resources, including time, material, equipment, and information, are provided for company business use. Nonetheless, occasional personal use is permissible as long as it does not affect job performance or cause a disruption to the workplace.

Employees and those who represent MCI are trusted to behave responsibly and use good judgment to conserve company resources. Managers are responsible for the resources assigned to their organizations and are empowered to resolve issues concerning their proper use.

Generally, we will not use company equipment such as computers, copiers, and fax machines in the conduct of an outside business or in support of any religious, political, or other outside organization activity, except for company-requested support to non-profit organizations. We will not solicit contributions, nor distribute non-work related materials during work hours.

In order to protect the interests of the MCI network and our fellow employees, MCI reserves the right to monitor or review all data and information contained on an employee's company-issued computer or electronic device, use of the Internet, or MCI's Intranet. We will not tolerate the use of company resources to create, access, store, print, solicit, or send any materials that are harassing, threatening, abusive, sexually explicit, or otherwise offensive or inappropriate.

Questions about the proper use of company resources should be directed to your manager.

15

## Media Inquiries

MCI is a high profile company and, from time to time, employees may be approached by reporters and other members of the media. In order to ensure that we speak with one voice and provide accurate information about the Company, we should direct all media inquiries to the Public Relations department. No one may issue a press release without first consulting the Public Relations department

# Do the Right Thing
*Because it's the right thing to do*

Several key questions can help to identify situations that may be unethical, inappropriate or illegal.  Ask yourself:

- Does what I am doing comply with the letter *and the spirit* of MCI's Guiding Principles and company policies?
- Have I been asked to misrepresent information or deviate from normal procedure?
- Would I feel comfortable describing my decision at a staff meeting?
- How would it look if it made the headlines?
- Am I being loyal to my family, my company and myself?
- What would I tell my child to do?
- Is it the right thing to do?

## Contacts

### *How to contact the Ethics Office*
The Office of Ethics and Business Conduct maintains a confidential Ethics Line. Employees are encouraged to contact the Ethics Line to discuss any ethics question or concern, to seek clarification or guidance about the Code of Conduct, to report potential wrongdoing or inappropriate conduct in the Company, or to seek a determination regarding a potential conflict of interest.

All contacts are kept confidential to the greatest extent possible, and efforts will be made to handle questions or concerns promptly, thoroughly, and discreetly. Employees may also contact the Ethics Line anonymously; should employees choose not to identify themselves, no efforts will be made to identify them.

Any employee who believes he or she has been subjected to retaliation should immediately contact the Ethics Line or Human Resources.

The Ethics Line may be contacted through any of the following ways:

| By telephone (toll-free): | By mail: |
|---|---|
| 1-877-624-0007 | MCI Ethics Line |
| V-net: 222-6111 | 1133 19th Street, N.W. |
| | Washington, DC 20036 |
| | E-mail: ethicsline@mci.com |

Ethics Line team members answer the Ethics Line from 9:00am – 5:30pm EST, Monday – Friday. A confidential voicemail box will record a message if the line is busy or if the contact occurs after business hours.

### *How to contact the Employee Relations Solutions Team*
Employees with workplace issues involving relationships with management, peers or other issues related to the work environment may also contact the Employee Relations Solutions Team through the Open Door line. Examples of these issues would include cases of sexual harassment, performance management disputes, disparate treatment, and/or violations of MCI's EEO and other workplace policies.

Employees can reach the Open Door line at 1-800-730-DOOR (3667) or at employee-relations@mci.com. An employee advocate will respond to the call and provide confidential advice, information and assistance.

### *How to contact the Audit Committee*
The Audit Committee of the Board of Directors of MCI has created a process by which employees may transmit information, questions, complaints or concerns regarding the Company's accounting, internal accounting controls or auditing matters. The Audit Committee may be contacted as follows:

18

Chairman, Audit Committee
MCI
c/o Corporate Secretary
22001 Loudoun County Parkway
Ashburn, VA 20147

The Audit Committee may also be contacted through the Ethics Office.

# EXHIBIT III

Ivy G. Bailey
Secy/Admin Asst.
Employment Law Division of LPP
MCI, Inc.
1133 19th Street, NW
Washington, DC 20036
(202) 736-6839 – Office
(301) 749-8283 - Home

November 22, 2005

**VIA FACSIMILE & MCI COURIER**

Nancy Higgins, EVP
Ethics Exec Trans Team
MCI, Inc.
22001 Loudoun County Parkway
Ashburn, VA 20147

      Re:   Ethics – Hostile Work Environment

Dear Ms. Higgins:

Although the situation has been ongoing and progressively worse, within the Employment Law Division I did not report any grievances to the Ethics Department. Working here in Employment I usually answer the telephone when the Ethics Department calls to resolve or seek the proper procedure to investigate any claim made by current or former employees. I did not have any confidence in the system. I met with Harvey D. Rumeld, VP Employment Law, twice, nothing was resolved I feel it only added to the hostile treatment.

I have been informed that I will be part of the lay-off when Verizon takes over. I am trying to work until the end and receive my severance. Incidences of blatant hostility are apparent. I have secured an attorney, and have been advised to exhaust all of the Administrative remedies within MCI before filing a claim with EEOC. Please inform me of any venue within MCI, Inc. to file a grievance that would not be controlled by or hand in hand with the Employment Department.

Thank you for your assistance.

Sincerely,

*Ivy G Bailey*

Ivy G. Bailey

Washington, District of Columbia

The foregoing instrument was acknowledged before me this
22nd day of November, 2005
by Ivy G Bailey
*Gwendolyn W. Penn* Notary Public
My commission expires GWENDOLYN M. PENN
NOTARY PUBLIC, DISTRICT OF COLUMBIA
MY COMMISSION EXPIRES 9-14-2009

*Attachment B*

MCI                    Fax:2027366346

## ✳✳ Transmit Conf. Report ✳✳

P. 1                                              Nov 22 2005  13:42

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 88060705 | NORMAL | 22,13:42 | 0'15" | 1 | # O K | |

Ivy G. Bailey
Secy/Admin Asst.
Employment Law Division of LPP
MCI, Inc.
1133 19th Street, NW
Washington, DC 20036
(202) 736-6839 – Office
(301) 749-8283 - Home

November 22, 2005

**VIA FACSIMILE & MCI COURIER**

Nancy Higgins, EVP
Ethics Exec Trans Team
MCI, Inc.
22001 Loudoun County Parkway
Ashburn, VA 20147

   Re: Ethics – Hostile Work Environment

Dear Ms. Higgins:

Although the situation has been ongoing and progressively worse, within the Employment Law Division I did not report any grievances to the Ethics Department. Working here in Employment I usually answer the telephone when the Ethics Department calls to resolve or seek the proper procedure to investigate any claim made by current or former employees. I did not have any confidence in the system. I met with Harvey D. Rumeld, VP Employment Law, twice, nothing was resolved I feel it only added to the hostile treatment.

I have been informed that I will be part of the lay-off when Verizon takes over. I am trying to work until the end and receive my severance. Incidences of blatant hostility are apparent. I have secured an attorney, and have been advised to exhaust all of the Administrative remedies within MCI before filing a claim with EEOC. Please inform me of any venue within MCI, Inc. to file a grievance that would not be controlled by or hand in hand with the Employment Department.

**Teamnet**
**Communications**

| | |
|---|---|
| **Name:** | Ivy G Bailey |
| **Phone:** | 202-736-6839 |
| **V-net:** | 222-6839 |
| **Mobile Phone:** | NA |
| **Alt. Phone:** | NA |
| **Pager:** | NA |
| **Pager PIN:** | NA |
| **Paging Co.:** | NA |
| **Pager Mail:** | NA |
| **Fax #.:** | 202-736-6346 |
| **Fax V-net:** | NA |
| **Email:** | ivy.bailey@mci.com |
| **Alt. Contact:** | NA |
| **Lang Preference:** | English |

**Personal Profile**

| | |
|---|---|
| **Title:** | Exec Secy/Admin Asst |
| **Department:** | Employment Law |
| **Status:** | Employee |
| **Cost Center:** | 0000059946 |
| **Cost Center Name:** | BENEFITS LAW |
| **PeopleSoft ID:** | 02812253 |
| **OneWorld No.:** | 008002415 |
| **SAP Company:** | T300 |
| **Mgmt:** | Harvey D Rumeld |

**Office Location**

| | |
|---|---|
| **Office Address:** | 1133 19Th Street Northwest Washington, DC 20036 USA |
| **Location Code:** | 003 |
| **Room #:** | 302 |
| **Mail Drop:** | NA |
| **Time Zone:** | EST (-5) |

Windows 2000
Internet Explorer 5.5 SP2
166.32.110.158

JavaScript - Enabled [1.3]
Java - Enabled

Resolution - 800x600
Last Login - 11 / 10 / 2005

Attachment A

Ivy G. Bailey
Executive Assistant
Employment Law, LPP
MCI, Inc.
1133 19th Street, NW
Washington, DC 20036
(202) 736-6839 – Office
(301) 749-8283 – Home

December 5, 2005

**VIA PDF EMAIL**

Paul E. Obidinski
Employee Relations Solutions Team
MCI HEADQUARTERS
22001 Loudoun County Parkway
Ashburn, VA 20147

Re:    Hostile Work Environment Complaint/Pending EEOC Complaint

Dear Mr. Obidinski:

Although, I requested that our meeting be held as soon as possible on Friday, December 2, 2005, I was not fully prepared. Moving up the date was my response to the continued harassment and ongoing situation I find unbearable. Please reference the attached emails.

Please understand that some key points were not disclosed during our meeting. Some years ago, before the problems with WorldCom were disclosed. Abraham, then supervisor of the Mail Room, handed me a business card from U. T. Thomas. He said he wants you to call him. I was standing outside smoking with Carol Broussard. We laughed because Carol made the comment "It must have been the junk in the trunk". I did call out of curiosity. In the course of our brief conversation, I asked him the one key question. Are you married? He said yes. To which I responded you must want your wife to Jerry Springer me on my way to my door. He lives near me, and had asked if he could come over. I told him I did not do married men. After a brief exchange, the call was ended we said goodbye. I hung up and threw the card away. As stated to you, I had seen him around, looked at his travel brochures, pictures. It was a hello and if I saw him while leaving work it was good evening. Please see the attached draft Statement of facts detailing the harassment I endured. I will be submitting the final version to you and EEOC. And will continue to update until such time.

Thank you for your assistance.

Sincerely,

*Ivy G. Bailey*

Ivy G. Bailey

Attachments



**Lawyer Locator**
Search Lawyer Locator
∎ By Lawyer
  By Location/Area of Practice
  By Industry/Practice Groups
  By Firm
  By Corporate Law Departments
  By US Government
  By US Law Faculty
Join the Legal Network
Request a Listing
About Lawyer Locator

**Legal Articles**

**Dispute Resolution**

**Legal Personnel**

**Legal Careers**

**Professional Resources**

**Customer Service**

**Experts and Services**



More resources...
∎ *lawyers.com*SM
∎ **Peer Review Ratings**SM
∎ **Practice Development Center**
∎ **Counsel to Counsel Forums**
∎ **eAttorney**
∎ **LexisNexis**TM
∎ **lexisONE® for Small Firms**
∎ **LawCommerce.com**SM
∎ **LawyerLocator.Co.Uk**
∎ **Anwalt24.de**
∎ **martindale.co.ll**

# Search the Lawyer Locator

New Search    Search Results   Previous Listing

**Myron D. Rumeld**
Member
Proskauer Rose LLP
1585 Broadway
New York, New York 10036-8299
(New York Co.)
Telephone: 212-969-3000
Fax: 212-969-2900
Telex: TRT 175719 ROPUT NY
Email: Send an Email

AV Peer Review Rated

**Admitted:** 1984, New York and U.S. District Court, Eastern District of New York; 1985, U.S. District Court, Southern District of New York; 1992, U.S. Court of Appeals, Second Circuit; 1993, U.S. District Court, Western District of New York; 1998, U.S. District Court, Northern District of New York

**Law School:** Columbia University School of Law, J.D., 1983

**College:** State University of New York at Binghamton, B.A, 1980 Phi Beta Kappa

**Biography:** Harlan Fiske Stone Scholar. Articles Editor, Columbia Law Review, 1982-1983. Law Clerk, Hon. I. Leo Glasser, United States District Court, Eastern District of New York, 1983-1984.

**Born:** New York, New York, October 28, 1958

**ISLN:** 901936736

**Web Site:** http://www.proskauer.com

▲ top        New Search   Search Results  Previous Listing

Lawyer Locator | Legal Articles | Dispute Resolution | Experts and Services
Legal Personnel | Legal Careers | Professional Resources | Customer Service

Home | Contact Us | About Us | Site Info | Products | Services
Media Room | Banner Sponsorships

Copyright | Terms & Conditions | Privacy Policy

*Attachment C*

# LPP Invoice Approval

**Client / Matter**

Number :  2005EMP01005                Corrected Matter Number: _____

Name :  Americas Project: Rreorganization and restructuring project for Internation and Wholesale business unit

Responsible Attorney :  Tremblay, Kathleen

To be reviewed by another attorney: _____

Change responsible attorney to: _____

Practice Area :  Employment

Sub Practice Area :  International Projects

Matter Type :  International (General)                Date To Attorney : 09/21/2005

Cost Center :  78356

GI Account Code :  0084301000

> **Return To Billing By :**
> 09/28/2005

**Vendor**

CMSweb Name :  Proskauer Rose LLP

SAP Number :  42954

PO Number :

> **Please check the box below if the time/costs associated with this invoice are merger-related. It is critical that we correctly identify all expenses relating to the merger.**
>
> [ ]     **Merger related**

**Invoice**

Number :  629927

Date :  09/14/2005

Budget Period :  08/2005

Amount :  60,950.73

**Approval**

By :  Tremblay, Kathleen                APPROVER'S INITIALS : KK

Date :

Approved Amount :

*If different than original amount please provide both revised amount and a brief explanation.*

> **PLEASE RETURN TO : "BILLING INBOX ROOM #778"**

MCI - Privileged & Confidential

Attachment D

## Tremblay, Kathleen K

**From:** Dowling, Donald C. [DDowling@proskauer.com]
**Sent:** Thursday, October 13, 2005 3:11 PM
**To:** Tremblay, Kathleen K
**Cc:** Rumeld, Harvey D; Rumeld, Myron D.; Kalpakis, Christopher
**Subject:** RE: Americas Project

I confirm our approval.

    --Don

Donald C. Dowling, Jr.
International Labor & Employment Counsel
Proskauer Rose LLP
New York

---

**From:** Tremblay, Kathleen K [mailto:kathleen.tremblay@mci.com]
**Sent:** Thursday, October 13, 2005 2:52 PM
**To:** Dowling, Donald C.
**Cc:** Rumeld, Harvey D; Rumeld, Myron D.; Kalpakis, Christopher
**Subject:** RE: Americas Project

Don, based on our calls, I am not processing the new bills you sent me today. Rather, I am processing your August Bill (your invoice number 49601.007) which totaled $60,950.73 minus 1012.00 and minus 2172.93.

This means you will be paid $57,765.58 on that bill.

Please confirm your approval and I will send it in for payment today.

KKT

Kathleen Kelly Tremblay
Associate Employment Counsel
MCI Law and Public Policy
1133 19th Street
Washington DC 20036
222.6247 vnet
202.736.6247 direct dial
202.736.6346 fax
Kathleen.Tremblay@mci.com

*This e-mail may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not the intended recipient, please advise by return e-mail and delete immediately without reviewing, copying or forwarding to others.*

---

**From:** Dowling, Donald C. [mailto:DDowling@proskauer.com]

10/13/2005

Attached are copies of the following Invoices

629927 - Americas Project, this invoice reflects change to disbursements per MCI

636506 - this invoice is for the Americas Project for the month of September 2005, all time on this invoice has been written off.

633534- Independent contractor invoice for the month of August 2005
Thanks

**From:** Tremblay, Kathleen K [mailto:kathleen.tremblay@mci.com]
**Sent:** Wednesday, October 12, 2005 10:13 AM
**To:** Dowling, Donald C.
**Cc:** Rumeld, Harvey D; Rumeld, Myron D.; Kalpakis, Christopher
**Subject:** RE: Americas Project

Don:

If you could get back to me on the disbursements and charges, I can send the bills in for payment. If I get them submitted this week, I am told they will be paid NLT October 31-- your fiscal year close.

KKT

Kathleen Kelly Tremblay
Associate Employment Counsel
MCI Law and Public Policy
1133 19th Street
Washington DC 20036
222.6247 vnet
202.736.6247 direct dial
202.736.6346 fax
Kathleen.Tremblay@mci.com

*This e-mail may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not the intended recipient, please advise by return e-mail and delete immediately without reviewing, copying or forwarding to others.*

-----Original Message-----
**From:** Dowling, Donald C. [mailto:DDowling@proskauer.com]
**Sent:** Tuesday, October 11, 2005 3:26 PM
**To:** Tremblay, Kathleen K
**Cc:** Rumeld, Harvey D; Rumeld, Myron D.; Kalpakis, Christopher
**Subject:** RE: Americas Project

Kathleen:

Thanks very much for this. As to your points ## 1-3, that is indeed exactly what we agreed to, and we can proceed accordingly.

10/13/2005

As to your point #4, obviously we stand by what we previously agreed to re disbursements, and I apologize for any disbursement charges on our bills not consistent with our prior agreement. I am checking with our billing dep't on this and they will be back to you very shortly. I'm also doing what I can to ensure we don't repeat any mistakes we may have made.

Thanks very much. We really appreciate your handling of this.

    --Don
Donald C. Dowling, Jr.
International Labor & Employment Counsel
Proskauer Rose LLP
1585 Broadway
New York, NY 10036

tel. 1-212-969-3075 (fax -2900)
ddowling@proskauer.com

Admitted in Oh. & Ill. only; NY pending

---

**From:** Tremblay, Kathleen K [mailto:kathleen.tremblay@mci.com]
**Sent:** Tuesday, October 11, 2005 3:18 PM
**To:** Dowling, Donald C.
**Cc:** Rumeld, Harvey D; Rumeld, Myron D.
**Subject:** Americas Project

Don:

Thank you so much for all your efforts in sorting through the cost overrun and billing issues that have surfaced with respect to the Americas Project. I think we can finally wrap this up.

As I mentioned by phone, we have reviewed the project deliverables and the billings to date. Based on our review, we have the following proposal with respect to sharing the cost of the budget overrun that occurred on this project.

The budget for the project was 175K. Total billings to date by Proskauer and its local counsel amount to $215,589 (including unbilled September time). This means we are a total of $40,589 over budget. You attribute $34,540 to the contractor template.

In order to complete the project, you anticipated another 15-20 hours of your time on this project. At your billable rate, that equates to just under $10,000.

Rather than sort through the project deliverables and billing entries one by one to determine how much to write off, we have discussed the following option:

1. MCI will agree to foot the cost of the template -- $34,540.

2. In return, you agree to finish the project with no additional billings from Proskauer or local

counsel. Basically, you are agreeing to donate the rest of the time it takes to complete the project which -- in your best estimate -- amounts to approximately $10,000 of legal fees.

3. You also agree to write off the remaining cost overrun, excluding the template, which amounts to $6049.00. [$40,589 minus $34,540]. You will do this by adjusting the August bill downward by $1012.00 and by not sending us a bill for September charges which total approximately $5,000.

4. Additionally, we noticed that your bills have been including "disbursements and charges" that are not permitted by our retainer Agreement. To that end, we are also asking that you readjust the August bill downward by an additional $2172.93 for the following charges:

Secretarial Overtime: $105.00
Word Processing      $1316.25
Proof Reading        $525.00
Local Travel         $106.00
Dinner Voucher       $83.93
Meals                $36.75

Furthermore, we would like you to assist us going forward by working with your billing department to ensure we will not receive future bills with "disbursements and charges" that are outside of the retainer agreement.

Please let me know if the proposal outlined herein is acceptable to you. If so, I will just process the August bill for payment minus the $1012.00 in fees and minus $$2172.93 in disbursements and charges. I understand you have a fiscal year deadline to meet and I think that would be the fastest way to facilitate the payment.

If you have any questions, please let me know,


Kathleen


------------------------------------------------------------------------------

This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.

======================================================================

------------------------------------------------------------------------------

10/13/2005

This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.

**Sent:** Thursday, October 13, 2005 2:41 PM
**To:** Tremblay, Kathleen K
**Cc:** Rumeld, Harvey D; Rumeld, Myron D.; Kalpakis, Christopher
**Subject:** RE: Americas Project

Kathleen:

Following up on pour call today, yes, we authorize you to write down the additional $2172.93 for disbursements.  If you want a document or reissued bill, etc., to that effect, pls. let me know.

    **--Don**
Donald C. Dowling, Jr.
International Labor & Employment Counsel
Proskauer Rose LLP
New York

---

**From:** Tremblay, Kathleen K [mailto:kathleen.tremblay@mci.com]
**Sent:** Wednesday, October 12, 2005 10:13 AM
**To:** Dowling, Donald C.
**Cc:** Rumeld, Harvey D; Rumeld, Myron D.; Kalpakis, Christopher
**Subject:** RE: Americas Project

Don:

If you could get back to me on the disbursements and charges, I can send the bills in for payment. If I get them submitted this week, I am told they will be paid NLT October 31-- your fiscal year close.

KKT


Kathleen Kelly Tremblay
Associate Employment Counsel
MCI Law and Public Policy
1133 19th Street
Washington DC 20036
222.6247 vnet
202.736.6247 direct dial
202.736.6346 fax
Kathleen.Tremblay@mci.com

*This e-mail may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not the intended recipient, please advise by return e-mail and delete immediately without reviewing, copying or forwarding to others.*

    -----Original Message-----
**From:** Dowling, Donald C. [mailto:DDowling@proskauer.com]
**Sent:** Tuesday, October 11, 2005 3:26 PM
**To:** Tremblay, Kathleen K
**Cc:** Rumeld, Harvey D; Rumeld, Myron D.; Kalpakis, Christopher
**Subject:** RE: Americas Project

Kathleen:

10/13/2005

Thanks very much for this. As to your points ## 1-3, that is indeed exactly what we agreed to, and we can proceed accordingly.

As to your point #4, obviously we stand by what we previously agreed to re disbursements, and I apologize for any disbursement charges on our bills not consistent with our prior agreement. I am checking with our billing dep't on this and they will be back to you very shortly. I'm also doing what I can to ensure we don't repeat any mistakes we may have made.

Thanks very much. We really appreciate your handling of this.

    --Don
Donald C. Dowling, Jr.
International Labor & Employment Counsel
Proskauer Rose LLP
1585 Broadway
New York, NY 10036

tel. 1-212-969-3075 (fax -2900)
ddowling@proskauer.com

Admitted in Oh. & Ill. only; NY pending

---

**From:** Tremblay, Kathleen K [mailto:kathleen.tremblay@mci.com]
**Sent:** Tuesday, October 11, 2005 3:18 PM
**To:** Dowling, Donald C.
**Cc:** Rumeld, Harvey D; Rumeld, Myron D.
**Subject:** Americas Project

Don:

Thank you so much for all your efforts in sorting through the cost overrun and billing issues that have surfaced with respect to the Americas Project. I think we can finally wrap this up.

As I mentioned by phone, we have reviewed the project deliverables and the billings to date. Based on our review, we have the following proposal with respect to sharing the cost of the budget overrun that occurred on this project.

The budget for the project was 175K. Total billings to date by Proskauer and its local counsel amount to $215,589 (including unbilled September time). This means we are a total of $40,589 over budget. You attribute $34,540 to the contractor template.

In order to complete the project, you anticipated another 15-20 hours of your time on this project. At your billable rate, that equates to just under $10,000.

Rather than sort through the project deliverables and billing entries one by one to determine how much to write off, we have discussed the following option:

10/13/2005

1. MCI will agree to foot the cost of the template -- $34,540.

2. In return, you agree to finish the project with no additional billings from Proskauer or local counsel. Basically, you are agreeing to donate the rest of the time it takes to complete the project which -- in your best estimate -- amounts to approximately $10,000 of legal fees.

3. You also agree to write off the remaining cost overrun, excluding the template, which amounts to $6049.00. [$40,589 minus $34,540]. You will do this by adjusting the August bill downward by $1012.00 and by not sending us a bill for September charges which total approximately $5,000.

4. Additionally, we noticed that your bills have been including "disbursements and charges" that are not permitted by our retainer Agreement. To that end, we are also asking that you readjust the August bill downward by an additional $2172.93 for the following charges:

Secretarial Overtime:$105.00
Word Processing     $1316.25
Proof Reading       $525.00
Local Travel     $106.00
Dinner Voucher     $83.93
Meals          $36.75

Furthermore, we would like you to assist us going forward by working with your billing department to ensure we will not receive future bills with "disbursements and charges" that are outside of the retainer agreement.

Please let me know if the proposal outlined herein is acceptable to you. If so, I will just process the August bill for payment minus the $1012.00 in fees and minus $$2172.93 in disbursements and charges. I understand you have a fiscal year deadline to meet and I think that would be the fastest way to facilitate the payment.

If you have any questions, please let me know,

Kathleen

--------------------------------------------------------------------------

This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.

10/13/2005

===============================================================================

-----------------------------------------------------------------------------

This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.

===============================================================================

-----------------------------------------------------------------------------

This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.

===============================================================================

MCI (INTERNATIONAL)
LAW AND PUBLIC POLICY DEPARTMENT, E2-216
2201 LOUDON COUNTRY PARKWAY
ASHBURN, VA 20147
ATTENTION: TRICIA HARRISON, DIRECTOR OF OPERATIONS

**629927**
**September 14, 2005**

---

**PROSKAUER ROSE LLP**   1585 Broadway
New York, NY 10036-8299     Employer Identification No. 13-1840454

---

CLIENT NAME: MCI (INTERNATIONAL)
MATTER NAME: AMERICAS PROJECT
OUR REFERENCE #: 49601.0007
MCI REFERENCE # 2005EMP01005
PO #: PO #: 7570096438

FOR LEGAL SERVICES RENDERED
for the period ending August 31, 2005 as set forth
in the attached printout.
Fees:                                                    $69,418.75
Less Adjustment (in addition to write-down on July bill)   ($4,386.25)
Less 10% Discount                                        ($6,503.25)
Out-of-pocket disbursements and other miscellaneous
charges posted through August 31, 2005                     2,421.48
**TOTAL THIS BILL**                                      **$60,950.73**

*Summary of "Americas Project"*
*The "Americas" project involves delivering "kits" detailing steps and calculations, and containing bilingual documentation (letters, releases, etc.), for a series of personnel actions across LatAm. These personnel actions are:*
- *10 RIFs: Terminations of 10 employees and contractors in various countries*
- *34 contractor conversions: Conversion of 34 independent contractors to employees—including 8 contractors in 4 countries who are subcontractors/employees of MCI contractors*
- *22 rate changes in contract: Convert rates of 22 contractors in various countries*
- *13 currency conversions: Convert currencies 13 employees/contractors in various countries*
- *Independent contractor template and local versions: Create new "best practices" independent contractor contract form, and create local versions for affected countries*

*Summary description of tasks performed in August 2005:*
- Received request from MCI to restructure project deliverable country "kits"—formerly structured by personnel action (RIF; rate change; etc. now.)—and restructured by country
- Received request from MCI to tailor country "kits" with employee-specific instructions, and reworked documents (formerly structured as general instructions for specific personnel actions per country) to employee/contractor-specific instructions, including:
  - ✓ tailoring letters and releases for each individual employee/contractor
  - ✓ offering employee-specific strategy alternatives and negotiation positions
- Learned from MCI that certain "contractors" were actually employees or subcontractors of other contractors; restructured country "kits" accordingly:
  - ✓ Collected new country-specific legal analysis to account for terminating employees-of-contractors

---

FOR YOUR CONVENIENCE YOU MAY WIRE PAYMENT TO:
CITIBANK, N.A., 111 WALL STREET, NEW YORK NY 10005
ACCOUNT NO. 02838341
ABA NO. 021-000089

Ivy G. Bailey
1630 Tucker Road
Fort Washington, MD 20744
(301) 749-8283

November 27, 2005

**VIA HAND DELIVERY AND PDF**

Eric H. Holder, Esq.
Covington & Burling
1201 Pennsylvania Avenue, NW
Washington, DC 20004

Dear Mr. Holder:

I am a current employee of MCI, Inc. I work as an Exec Secertary/Aministrative
Assistant. (Attachment A Teamnet printout). I have been employed at MCI, Inc. for
over five years, from temporary to permanent employee. I am writing to you because I
am seeking a way to maintain my job and receive my severance package. I sent a
letter via facsimile and PDF to Nancy Higgins, Executive Vice President, Ethics Exec
Trans Team. (Attachment B Letter and Fax confirmation). I was complaining about the
hostile work environment in the Employment Law Section of Law and Public Policy. I
realize now that my complaint may have shown that it was a flaw in the Department that
she is the Head Executive of. My complaint was is the fact that Ethics is working hand-
and-hand with the Employment Law Section. When Ethics was set up, my
understanding at that time that it was an independent branch that would investigate any
complaint that employees made about anything that was unethical. The two employees
that were reassigned to the Ethics Department in a supervisory capacity I know former
LPP attorneys that would call Harvey D. Rumeld VP Employment Law to speak to and
ask if he would be available are; Mark Erlich, Esq., Nichole Bynum, Esq.. Steve Helvin
calls also. I have no faith or confidence in the system.

My problems with Mr. Rumeld began shortly after the new management came on board,
Stasia Kelly and Carol Petren. To pinpoint exactly when it started is when his brother
Myron D. Rumeld, Esq. the then partner of Proskauer Rose, LLP sent an agreement
that was signed and approved by Harvey D. Rumeld. (See attachment C Martindale
printout). Kathleen K. Tremblay, Esq. is the employment attorney that deals with the
firm for international law and law firms in Latin American that Proskauer Rose, LLP
recommends. (Attachment D processed invoices and emails to Proskauer Rose, LLP).
Ms. Tremblay is a yeller. Each month she would loudly complaint about the invoices,
overcharging, poor attorney work product. I don't know who gave the approval from
senior management. Harvey D. Rumeld did sign the agreement his brother Myron D.
Rumeld submitted from his firm. Before it was signed Myron Rumeld called and asked
for directions to and whether the meeting was to be held at the 19th street, NW office or

Ashburn, Virginia, MCI, Inc. Headquarters I relayed the message to Harvey Rumeld he was out of the office I called his brother's office to confirm that the meeting was in Ashburn his secretary asked how far it was from Dulles. I told her it was close and that he could probably catch a cab.

The arrangement that was made appeared to be unethical. I did discuss it with my peers and reached the conclusion that it was business as usual nothing had changed same old WorldCom. I was then transferred to the other attorneys on the Employment team.

This year, as I stated above Kathleen K. Tremblay is a yeller. We were under tight deadlines to submit packages to out side entities that were reviewing cases within the employment law section. David R. Shopfner is the senior attorney at one time he did use that title. He needed over 10 documents scanned. I had to leave my desk and go to the seventh floor to use the scanner clean them up which required that I take out any thing that was added and correct any type that was scrambled in the process. Kathleen asked that I make corrections to a document that she had to submit. David walked up and needed over 10 more documents converted per scanner. I made the changes in the document as Kathleen needed. Closed and went back to the seventh floor. When I got back Kathleen came up to my desk and fussed at David for taking up a lot of my time. She went back to her office and the yelling began. I did not know that the document was write protected. None of the changes were there and the document's footnotes were wrong. I know a lot of the functions of Microsoft Word and eventually figured out that the document was write protected. After the yelling I was told to fix the document now. More yelling and I wrote the episode off as Kathleen is a volatile person anyway add to that she is pregnant. She was going off. I made the edits copied and saved it as a separate document. Shortly after Harvey D. Rumeld said to me Ivy I know you know were a Popeye's Chicken is, those biscuits. It stuck me as being odd, he had a few years ago invited the group to his house for a cookout. The email invitation said it was a Kosher house. I had heard that Popeye used lard. Eric M. Cotts was standing next to him. From then on it has gone down hill. It has been implied that I was in love with David. My computer has been gone through. A case that Harvey worked on a settlement with U. T. Thomas. Was shown to me although I faxed the agreement to Mr. Thomas' home fax machine. I was asked if I would like a Hundred Thousand by Eric M. Cotts. Little dramas are being staged. Unnerving, frustrating, harassment. There are more incidences. I will file an EEOC Complaint.

I know the deal with Verizon is in its final stages. This is not sour grapes I was told that I will be in the layoff. I am trying to work to the end in order to receive my severance. I have other incidents and proof that I am being harassed. I refuse to loose my dignity. I am not going to be provoked into quitting. It was announced that Harvey D. Rumeld will be Verizon's VP General Counsel and several of the Employment Law staff will be joining him or have been promised a job with his help.

Eric H. Holder, Esq.
November 27, 2005
Page 3 of 3

Mr. Holder I pray that there is no impropriety being committed by me. My understanding that you being a former U.S. Attorney General for the District of Columbia and a member of MCI, Inc.'s Board know that the attached documents are submitted as proof.

Please confirm that you have received my letter and attachments by certified letter return receipt.

Thank you for your assistance.

Sincerely,

Ivy G. Bailey

Attachments

**Bailey, Ivy G**

| | |
|---|---|
| **From:** | Rumeld, Harvey D |
| **Sent:** | Wednesday, October 26, 2005 4:21 PM |
| **To:** | Bailey, Christina A; Shopfner, David R; Cotts, Eric M; Bailey, Ivy G; Spector, Jeffrey A (Jeff); Tremblay, Kathleen K; Rossel, Maria A (Maria); Henderson, Tracy P |
| **Subject:** | FW: LPP DAILY EMAIL - OCTOBER 26, 2005 |
| **Attachments:** | Annual Ethics Refresher Training.htm |

This is what we will be doing on November 4th in joint session with the Litigation Team. This is intended to be a participatory exercise. Please come prepared to discuss any experiences you have had in the course of your employment which raise ethical issues.

Harvey

-----Original Message-----
**From:** Kelly, Anastasia (Stasia)
**Sent:** Wednesday, October 26, 2005 4:07 PM
**To:** LPP_Allhands@lists.mci.com; EMEA_LPP@lists.mci.com
**Cc:** Knox, Jennifer H (Human Resources); Lucht, Peter K
**Subject:** LPP DAILY EMAIL - OCTOBER 26, 2005

# MCI
# LPP DAILY EMAIL
# OCTOBER 26, 2005

## Annual Ethics Refresher Training

We are entering the home stretch for completing the 2005 annual ethics refresher training, which was announced via the attached message from Nancy Higgins to Directors and Above on September 22nd as part of MCI Values Month. The training consists of a live, manager-led, 1-hour exercise in which employees themselves create discussion scenarios based on actual ethics and business conduct situations they have encountered at MCI. Every MCI employee is required to participate in this training as part of our ongoing agreement with the U.S. General Services Administration (GSA).

I strongly encourage you and your teams to complete this training by November 6th. Materials for the MCI Ethics Conversation, including suggested methods for developing discussion scenarios, may be downloaded from the Ethics and Business Conduct website. Click on the "Ethics Training" button for details.

Thank you for ensuring that LPP leads the way in complying with this important initiative.

Stasia

**Please send news about your department, questions, or comments for the Daily Email to dolores.vismara@mci.com using "Email News" as the subject line.**

## Talking Points for Ethics Meeting

Hostile Work Environment

I don't remember exactly when, some time in March, it was, after one of the numerous job interviews that I was complaining to D. Shopfner that during the interview the person talked about several personal things in her life. Her second husband had died suddenly. She was still friends with her first husband. This went on and on. People have a tendency to tell me more than I need to know. If it does not impact on my life I usually forget it.

I have not been so crazed for any man (not since teenager) that I would imagine that it was more than a friendly relationship.

The yelling and screaming was unnerving. I accepted an apology. That I thought was the end.

When asked about Popeye's Chicken or Farrakhan do you imagine the race card is being played not in your favor.

My computer was gone through. I don't e-mail my daughter because she is certified in several fields within IT. We have discussed how systems can be penetrated. So for her and my well being we do not use the computer here to send or receive e-mails.

I did look at and fax Mr. Thomas' settlement agreement and why was it presented in such an obvious way after the fact. Yes, I could use $100,000.

If you want to know more about Marcus L. Bailey and why he was not at Patuxent High and was at New Dominion School, Oldtown, MD. Please, see me; also prepare to make a donation to his college fund.

Snide remarks, a little crazy but not stupid.

Respectfully Submitted

Prayer for relief

I have a sense of humor and love irony. And would not hurt or damage anyone for sport, it usually comes back to you.

# EXHIBIT IV

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Washington Field Office

1801 L Street, N. W., Suite 100
Washington, D. C. 20507
(202) 419-0713
TTY (202) 419-0702
FAX (202) 419-0740
Toll Free (866) 408-8075
General Information (800) 669-4000

April 20, 2007

Ms. Ivy Bailey
1630 Tucker Road
Fort Washington, MD 20744

RE:  Notice of Right to Sue

Dear Ms. Bailey:

Due to an administrative error, the "Dismissal and Notice of Rights" that was mailed to you on
or about February 23, 2007, was mailed without the proper postage. Therefore, I am enclosing
the Dismissal and Notice of Rights that was issued on February 23, 2007. Please note that this is
not a reissued Dismissal and Notice of Rights, but rather, it is a copy of the one that was issued
on February 23, 2007. If you wish to pursue the charge on your own, your lawsuit must be filed
in Federal District Court within 90 days of receipt of the Dismissal and Notice of Rights. This
correspondence does not constitute any extension of the 90 day filing period.

Sincerely,

*Janet A. Stump*

Janet A. Stump
Enforcement Supervisor

Enclosures

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Ivy G. Bailey<br>1630 Tucker Road<br>Fort Washington, MD 20744 | From: | Washington Field Office - 570<br>1801 L Street, N.W.<br>Suite 100<br>Washington, DC 20507 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 570-2006-00938 | Janet Stump,<br>Enforcement Supervisor | (202) 419-0713 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Dana R. Hutter*

Dana Hutter,
Director

FEB 2 3 2007

(Date Mailed)

Enclosures(s)

cc:   Diann James
Senior Staff Consultant
VERIZON
13100 Columbia Pike
Room 531
Silver Spring, MD 20904